King, J.
This action is brought on behalf of the state of Ohio by the prosecuting attorney of Franklin county, Ohio, under the direction of the attorney general for the state of Ohio, seeking to restrain the defendant from engaging in practices violative of the provisions of the Code of Fair Competition relating to the dry cleaning industry, which Code of Fair Competition was enacted by the General Assembly of Ohio. This act became effective December 20, 1933.
The plaintiff alleges in substance in its petiton that the Code of Fair Competition provides that, “No employee, other than a plant employee, shall be paid less than $13.50 per week, and no plant employee shall receive less than thirty cents per hour.” Further, that no employee shall be permitted to work more than six days in any seven day period. The Code of Fair Competition further provides a schedule of fair and reasonable prices calling for a charge *34 of not less than 75 cents for dry cleaning men’s suits, top coats and overcoats, and class 1 women’s dresses.
The plaintiff further alleges in substance that the defendant has peristently and constantly violated the provisions of the Code of Fair Competition in that it has caused employees, namely, clerks in stores to work for the sum of $12,60 per week; also it has caused employees working as a combination of fireman, janitor and night watchman in one of its plants to work seven consecutive days per week, aggregating 84 hours per week, at a salary of $12.00 per week.
The plaintiff further alleges that defendant is violating the provisions of the Code of Fair Competition with reference to the minimum price fixed by the Code to be charged for its services.
Plaintiff further alleges that these actions of the defendant have demoralized and are demoralizing the entire industry in the local area; that it is resulting in a great loss to other members of the trade who are observing the provisions of the said Code, and that their purchasing power and ability to employ help is thereby impaired. And fur-, ther this plaintiff says that the defendant is willful in its continued violations and that it has refused to cease its unfair practices or to place any claims for exemptions or exceptions, as provided for by the Code, but on the contrary has repeatedly announced its intentions to continue such violations and actually is continuing in said violations against the provisions of the statute providing for the cooperation of this state with the federal government in effectuating the policies of the National Industrial Recovery Act passed by the Congress of the United States.
The cause was submitted to the court upon the petition of the plaintiff, an agreed statement of facts, oral testimony adduced on behalf of defendant, oral arguments and exhaustive and well prepared briefs furnished the court by respective counsel.
It is agreed that defendant violated the Code of Fair Competition with reference to these requiremnts of hours of labor required per week, and also the minimum wage requirement, the defendant consenting, however that a restraining order might be granted as to these violations.
*35 Defendant admitted that he had violated the Code in not charging the minimum price and would continue to do so unless restrained.
The court has carefully considered the evidence adduced and the briefs submitted by counsel in support of their respective contentions. A number of constitutional objections are urged by the defendant against the law regulating the cleaning and dyeing industry upon the violation of which plaintiff predicates its right to the relief it seeks.
The court has reached the conclusion that a decision herein rests upon the solution of the following propositions, to-wit:
(1) Is the regulation by the General Assembly of Ohio of the cleaning and dyeing industry a proper and valid exercise of the police power?
(2) Is the minimum price as fixed as a charge for services rendered by the industry arbitrary and unreasonable?
The Act of the General Assembly of Ohio in question known as House Bill No. 705 is an act designed to meet the great economic crisis which is nation-wide and which has been so disastrous in its effect on the happiness and well being of the people of this nation.
The title of the Act discloses the object and purpose sought:
“To provide for the cooperation of this state with the federal government and its officers and agencies in effectuating the policies of the National Industrial Recovery Act of the Congress of the United States, and the Act of Congress entitled, ‘An Act to relieve the existing national economic emergency,’ approved May 12, 1933, in order to encourage industrial recovery, to reduce unemployment, to foster fair competition, to eliminate unfair competitive practices, and to stimulate the marketing of agricultural commodities, by the enactment of legislation of like nature relating to transactions in the state of Ohio, including those affecting intrastate commerce only.”
Here is an attempt on the part of this branch of the government to afford relief through the adoption of certain ethical standards and ideals to meet a most serious economic condition. No person has escaped the effects of the so-called “panic or depression.” Fortunes have been *36 wiped out, values have been destroyed, agricultural interests bankrupt, industry demoralized, millions of men out of employment, thousands homeless through inability to pay for mortgaged indebtedness either through lack of employment or because financial institutions in which they had placed their money are in the process of liquidation. It is common knowledge that the federal government, in keeping with a government’s duty to its people in attempting to alleviate the suffering of the people, has expended billions in ‘“feeding the hungry,” “clothing the naked,” and “housing the homeless.” These conditions are a direct challenge to the government to employ such means and to promulgate such measures as will effectively eliminate the evils inimical to the happiness and welfare of the people.
The members of the General Assembly, of course, took cognizance of these conditions and were also familiar with the conditions pertaining to the industry in question. The legislation in question is an attempt to meet the situation so far as the dry cleaning- industry is concerned by regulation which insures to its laborers a fair wage and reasonable hours of labor; to the members of the industry protection against unfair competitive practices, and the public is sought to be protected from the evils that flow from industrial conflicts such as wage disputes, racketeering and inferior service resulting from cut-throat competitive practice.
The defendants contend that such regulation is an unwarranted invasion of their private rights in property and violative of their constitutional guarantee; that such legislation is not a valid exercise of the police power.
The question therefore arises, is the legislation a valid exercise of the police power? Under the police power, the government has not only the right but a duty to regulate an industry when such regulation has a substantial relation to the morals, safety or welfare of the people, but as Judge Allen, speaking for the court, said in the case of Fritz v. Messer, in 112 O. S., at page 639:
“If the legislation discloses no purpose to prevent some public evil or to fill some public need, and has no real or substantial relation to public health, welfare, morals, or *37 public safety, it must be held void. When, however, legislation does have a real and substantial relation to the prevention of conditions detrimental to the public welfare, health, safety or morals, no matter how unwise the measure itself seems to the individual judges, it is not for the judicial tribunals to nullify it on constitutional grounds.”
Keeping in mind the definition of the police power -of the state above given, we inquire, does the legislation in question have a substantial relation to the safety and welfare of the people. Does the legislation seek to cure and prevent conditions detrimental to the public safety, welfare and morals? Does this legislation seek to fill some public need or prevent some public evil? That the legislation in question squarely meets these tests in our opinion is conclusively disclosed by an analysis of the uncontroverted facts in evidence.
The evidence disclosed,
“The trade has been harassed for the past three years by cut-throat competition, which in many cases has led to racketeering, brought about by slashing prices below cost, lowering wages, accompanied often by sweating labor, offering inferior quality and poor service.”
It was admitted in evidence that the tactics
“Have almost completely demoralized the business of the plant owners and has caused untold hardship to some 175,000 or more tailor shops serving as retail outlets. The credit of the industry is practically ruined. In one city alone over $600,000 is long past due in wages owing to laborers of the cleaning and dyeing industry.”
In the agreed statements of facts it further appears that the above conditions are “primarily caused by price cutting, exploiting labor, and rendering inferior quality and service to the public.”
The great majority of the members of the industry manifested and are now manifesting a willingness to cooperate with governmental agencies in the enforcement of regulatory measures eliminating the evils of the industry. In the trial of this case it appeared that out of 380 members in this area the two defendants were the only ones who had refused to cooperate. In face of these undisputed facts in evidence we now inquire, is not legislation preventing price *38 cutting which leads to “racketeering” and its attendant evil consequences to the public, justifiable? Is not legislation which prevents slashing prices below cost, accompanied by lower wages and often sweating labor justifiable?
The industry is primarily engaged in the rendering of a service. Is not a regulatory measure justified which eliminates practices in the industry that causes an inferior service to be rendered the public? The answer to these conditions is obvious.
Beyond these considerations the legislation here under consideration is a part of a nation-wide program proposed to give relief from the great economic crisis through the effort to rehabilitate industry. Counsel for defendant contends that the industry here regulated is not clothed with a public interest justifying the setting of a minimum price. In the case of Leo Nebbia, v. The People of the State of New York, recently decided by the Supreme Court of the United States, Justice Roberts said:
“The thought seems to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that however able to regulate other elements of manufacture or trade with incidental effect upon price the state is incapable of directly controlling the price itself. This view was negativled, many years ago. * * * * * It is clear that there is no closed class or category of businesses affected with a public interest, and the functions of courts in the application of the Fifth and Fourteenth Amendments is to determine' in each case whether circumstances vindicate the challenged regulation as a reasonable exercise of governmental authority or condemn it as arbitrary or discriminatory. The phrase ‘affected with a public interest’ can in the nature of things mean no more than that an industry, for adequate reason, is subject to control for the public good. So far as the requirement of due process is concerned, and in the absence of other constitutional restrictions, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislative arm, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are *39 satisfied, and judicial determination to that.effect renders a court functus officio.”
The court further said that if the purpose of legislation is to restrain harmful or disastrous practices of competition, it does not lie with the court to question the policy, if the measures adopted to curb such practices are not arbitrary or discriminatory.
The case of Louis Bernstein v. Retail Cleaners & Dyers Association, 31 N. P. N. S. 433 [O. L. B. & R. 3-12-34] was a case in which the plaintiff asked the court to enjoin the defendant from picketing the plaintiff’s dry cleaning establishment. The defense was based upon the ground that the plaintiff had failed to comply with the minimum price provision of the dry cleaners’ code. It appears from the record of that case that the plaintiff there, like the defendants in the instant case, had at first agreed' to comply with the provisions of the dry cleaners code, later refusing. Judge Harris, in refusing to enjoin the picketing, said among other things that plaintiff’s action in violating the price provisions of the code was contrary to public policy, thus depriving him of the right to equitable intervention to prevent picketing. At page 435 of the opinion, he says:
“Indeed it is altogether probable that plaintiff might be proceeded against by injunction to stop his unfair competition with defendants.”
We come now to the consideration of the second proposition, namely, is- the' minimum price as fixed and determined, fair and reasonable, or is it arbitrary, unreasonable and discriminatory? The solution of this question is attended with difficulty due to the unsatisfactory state of the record. There is a lack of satisfactory evidence, in our opinion, touching the essential factors here involved. It is not for the court to fix a minimum price, but to determine whether the minimum price as fixed is reasonable, just and fair or arbitrary, unreasonable and discriminatory. It appears that the minimum price fixed was based upon a complete survey made by an administrative board before which representatives of the industry appeared. It further appears that the first price of 95 cents was later *40 changed to 75 cents, the present minimum. In this connection it appears to the court, if the minimum price is unreasonable others would join with the defendant in complaining.
The defendant contends that the act is unconstitutional for the reason that no differential has been fixed between the cash and carry and the credit and delivery business. The court is not satisfied that this contention is correct. However, in view of the situation here suggested we have decided to afford an opportunity for the further introduction of testimony on this point, in the meantime temporarily restraining the defendant from violating the provisions of the Code of Fair Competition with reference to hours of labor, minimum wage and minimum price.
An order may be drawn in accordance with the findings herein made.